IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| In the Matter of the Seizure of Cryptocurrency on a Black Trezor Device Seized on June 11, 2025 | 2:26mj489 DAO |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEIZURE WARRANT**

I, Jonathan Helmstetter, Special Agent, IRS Criminal Investigations("IRS-CI"), being duly sworn, declare and state as follows:

**PURPOSE OF THE AFFIDAVIT**

1. I make this affidavit in support of an application for the issuance of a seizure warrant to seize the following funds (the "TARGET FUNDS"):

- All cryptocurrency in a black Trezor wallet seized from Joseph Mori's ("Mori") home on June 11, 2025, which was used for Exseedingly's cryptocurrency exchange business including:

  - Up to 0.433157 BTC

  - Up to 6,544.68 Tether USDT (Ethereum Blockchain)

  - Up to 506.0188 USDC (Ethereum Blockchain)

  - Up to 25.1978 ETH

  - Up to 5,005 USDT (Polygon Blockchain)

  - Up to 1,555 USDT

2.      For the reasons specified below, there is probable cause to believe the TARGET FUNDS are subject to forfeiture and seizure as follows:

*Civil Seizure and Forfeiture*

a.  Pursuant to 18 U.S.C. § 981(a)(1)(C) because the TARGET FUNDS are property, real or personal, which constitute or are derived from proceeds traceable to violations of 18 U.S.C. § 1343 (Wire Fraud). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. A "specified unlawful activity," as defined in § 1956(c)(7), includes offenses listed in 18 U.S.C. § 1961(1). Section 1961(1) includes Wire Fraud.

b.  Pursuant to Section 981(a)(1)(A) because the Target Funds are property, real or personal, which were involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957.

c.  Consequently, seizure of the TARGET FUNDS for civil forfeiture is authorized by 18 U.S.C. § 981(b).

*Criminal Seizure and Forfeiture*

d.  Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because the TARGET FUNDS are property, real or personal, which constitute or are derived from proceeds traceable to Wire Fraud.

e.  Pursuant to 18 U.S.C. § 982(a)(1) because the TARGET FUNDS were involved in one or more violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) (Concealment Money Laundering), 1956(h) (money laundering conspiracy), and 1957 (spending).

3.      Consequently, seizure of the TARGET FUNDS for criminal forfeiture is authorized by 21 U.S.C. § 853(f) and 18 U.S.C. § 982(b)(1).

4.      A restraining order for the TARGET FUNDS under 21 U.S.C. § 853(e) would likely not adequately protect the property sought for forfeiture. Based on my training and

experience, I know that cryptocurrency can easily be moved and transferred. Wallets like the trezor wallet can be cloned and reconstituted, allowing any cryptocurrency in the wallet to be transferred to another wallet or spent in a transaction.

## BACKGROUND OF AFFIANT

5.     I am a Special Agent with the Internal Revenue Service ("IRS"), Criminal Investigation ("IRS-CI").  I have worked for the IRS as a Special Agent since approximately May of 2009.  My formal education includes a Bachelor of Science degree from Ramapo College of New Jersey where I majored in Accounting and minored in Computer Information Systems. In addition, I have received extensive training with respect to investigating tax crimes, money laundering, financial crimes, and other criminal violations at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  During my continued employment as a Special Agent with IRS-CI, I have investigated several cyber-related cases to include business email compromises, computer intrusion, ransomware, cryptocurrency Ponzi schemes, and other related crimes.  I currently hold the designation of a Certified Anti-Money Laundering Specialist.

6.     I have conducted and participated in numerous investigations into mail and wire fraud, money laundering, and other financial and computer crimes.  As an IRS-CI Special Agent, I am familiar with the use of financial accounts by those who operate fraudulent schemes and the types of transactions reflected on financial records.  I am also familiar with the principles of tracing assets into ad through financial accounts, including the subsequent purchase of property using the originally traced assets.  I was also aided by Federal Bureau of Investigation ("FBI") Task Force Officer Scott Pugmire whose home agency is the Utah State Bureau of Investigation, Utah Department of Public Safety.

7.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other witnesses and agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested seizure warrant and does not set forth all of my knowledge about this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

**PROBABLE CAUSE**

A. *Summary*

8.      As further described below, I have been working on an investigation into multiple schemes involving Joseph Mori, an individual residing in the State of New York, who appears to be running (or to have run) a cryptocurrency investment fraud and Ponzi scheme online, successfully eliciting investments from many Utah residents. Mori has previously been convicted in the State of New York for forged instruments and by the Southern District of New York for participating in a fraudulent advance fee scheme. He was under supervised release in the Southern District of New York throughout the period of the events described below.

9.      In October 2023, before discovering the investment fraud scheme, law enforcement received report that a Utah-based risk management company ("Victim 1") fell victim to a Business Email Compromise ("BEC") scam. A BEC is "a sophisticated scam targeting businesses that perform electronic payments such as wire or automated clearing house transfers. The scam is frequently carried out when a subject compromises legitimate business email accounts through social engineering or computer intrusion techniques resulting in an unauthorized transfer of funds." (ic3.gov, 2020)

10.     The following information was provided by representatives of Victim 1 and a law firm that was involved in settlement of a lawsuit with a Utah municipality. Victim 1 represented a Utah municipality in a civil suit brought by claimants. Victim 1 agreed to a settlement with the claimants for $779,600.00. Victim 1 received an email from what appeared to be the attorney representing the claimants with wiring instructions for the settlement funds. However, the email address that sent was spoofed by Unidentified Subjects by registering and using the email

domain "tagteam**s**law**s**" (two additional letters "s") to impersonate a person with an email address from the legitimate email domain "tagteamlaw.com."

11.     Wild West Domains, the domain registrar provided records indicating the perpetrators had registered one imitation domain "tagteamlaw**s**.com" on February 1, 2023, and the second imitation domain "tagteam**s**law**s**.com" on October 5, 2023.

12.     The fraudulent email included an attachment containing wiring instructions for the settlement funds on the claimant's attorney's letterhead. The fraudulent attachment instructed Victim 1 to send the funds to Global Office Group Inc., Thread Bank, 210 East Main Street, Rogersville, TN 37857, and account # XXXXXXXX1064.

13.     On October 26, 2023, Victim 1, following the fraudulent wiring instructions, wired $779,600.00 to the above Thread Bank account. This wire was to pay the agreed upon settlement amount. Shortly after the wire was sent, Victim 1 received notification from the claimant's attorney that the wire was never received. Upon further investigation, Victim 1 realized Global Office Group is unrelated to the previously referenced lawsuit and has no legitimate reason to receive money from Victim 1, and they had been victimized in a BEC scam.

14.     According to records received from Thread Bank, account # XXXXXXXX1064 is registered to Global Office Group Inc., 31 Edge Hill Road, Wappingers Falls, NY, 12590. This address is a residential home, with Joseph Mori as its principal.

15.     A publicly available internet search of the New York State, Division of Corporations website for Global Office Group Inc., returned an active domestic business corporation listing, #5591281 (Figure 2 below). The initial filing of the business entity took place on July 23, 2019. The Chief Executive Officer (CEO) is Joseph Mori ("Mori") and the address is 31 Edge Hill Road, Wappingers Falls, NY, 12590.



*Figure 1 - New York State Division of Corporations Website Result*

16. According to publicly available information obtained from the Bureau of Prisons and the United States District Court for the Southern District of New York, Mori served federal prison time for wire fraud and was prosecuted in the Southern District of New York. Mori's incarceration lasted for the duration of one year from 2022 through 2023. Public reporting also indicates that Mori was convicted in New York State courts in 2008 in connection with creating fraudulent insurance certificates.

17. During a telephonic interview conducted by TFO Pugmire regarding BEC Funds from Victim 1 detailed above, Mori said Global Office Group Inc. is an Information Technology ("IT") company that is involved in setting up and maintaining blockchain servers, web hosting, and general IT services. Global Office Group Inc. utilized the Thread Bank account for its financial needs. The Thread Bank account was frozen after the fraudulent wire transfer was conducted.

18.     According to Mori, he sells Bitcoin (BTC) cryptocurrency as a secondary way of obtaining funds. Mori offers the procurement and sale of Bitcoin to customers who may not be able to obtain an account on a legitimate cryptocurrency exchange. Mori describes his customers as people with red flags. He further described people with red flags as those that don't have passports, Social Security Numbers, or have other issues that would preclude them from gaining user accounts at a legitimate cryptocurrency exchange.

19.     Mori recalled seeing the wire transfer from Victim 1 come into his bank account with a note related to the settlement. According to Mori, it is not uncommon for him to receive into his account funds that he was not expecting. He assumed the $779,600.00 was related to his BTC business and transferred $50,000.00 to a US Bank account also in the name of Global Office Group Inc. The bank account listed the account address 31 Edge Hill Road, Wappingers FL, New York, 12590.

20.     In other words, by MORI's own admission, he is engaged in receiving money on behalf of people with red flags who cannot obtain legitimate accounts, and transmitting that money to third parties on their behalf so they can purchase cryptocurrency. Further by his own admission, he uses the accounts of his business Global Office Group to conduct this money transmitting. According to FinCEN records, neither Mori nor his businesses, including Crypto Calypso, Ltd. and Exseedingly Consulting, Inc., are licensed to conduct transactions on the behalf of others as a money service business.

21.     In addition, we have conducted an investigation of his businesses Crypto Calypso, Ltd. and its successor, Exseedingly Consulting, Inc. The investigation includes, among other things, review of financial records for these and related businesses, review of recordings of

"town halls" Mori held with investors in these businesses, review of his cryptocurrency wallet, and an undercover operation.

22.    The wife of an investor in Exseedingly Consulting (the investor himself has medical issues) directed the law enforcement agents to the recordings of three town halls held by Joseph Mori. I have reviewed those recordings and recognize as Joseph Mori the voice and image of the person who identifies himself in the recordings as Joseph Mori.

23.    In his townhalls, Mori described his business, which was essentially to receive U.S. dollars from someone who wanted to purchase cryptocurrency but was not permitted to do so through the normal exchanges, and to transfer their money to someone willing to sell them cryptocurrency. Mori also received the cryptocurrency from the seller into his trezor wallet, and transferred it to the cryptocurrency purchaser. He acted as a middleman and charged a commission of between 1% and 10% of the transaction. Here is a rough transcription of an excerpt from one recording where he describes the business operation:

> So I'll get, let's say a gentleman approaches me , I want to sell some coin . And then I have another person that says, I want to buy some coin . But the two can 't never agree on procedures. So I'm the middleman. So what I'll do is I'll work out a deal with each side. And let's just say, just for argument's sake, it's a million dollar deal. So I'll book, I'll get the person that has the coin ready, get all the paperwork together . The person then wants to buy the coin, get t hem ready, get all the paperwork together . They'll prove up what they have. So each side will show me what they got. Then I'll have the person will send me the coin and then the other person send me the money. Once I receive both, I'm basically acting almost as an escrow, but I'm not a lawyer. But escrow like. And then so then I'll send each side their respective, money and coin. And then I make a percentage of that transaction . So let's just say 2%. So out of a million dollars, I'll make a 2% transaction fee without having to actually put up any money of my own.  But I also guarantee the deal because I'll tell both sides, listen, I have a million dollars sitting in the bank right now. Here it is. If either side doesn't perform, I can kick it in and take it. So that makes everybody comfortable. If I have to do proof of funds, I could do it. You know, you know, if one side doesn't want to do something, I can always do it myself. So I get it all taken care of . And that's that's it. I'll do this multiple times a day . So, you know, if you do 2%, do it five times a day, it's 10% a day. It adds up to a lot of money in a month . Now there are some deals which are more lucrative

than others . Like for instance , when I do business with people in, let' s say, Africa , they can 't buy a coin , you know, in Africa , most places . So they'll wire me the money and then I'll get them the coin. And those transactions, you know, usually I charge 10% because it's, you know, it's a bigger deal.

24.    As indicated above, Mori repeatedly told investors that all the U.S. dollars and cryptocurrency flowed through him and his trezor device. He showed them the trezor device in at least one of the town hall recordings but referenced it in all three recordings available to law enforcement. He assured investors that all the funds and coin flow through him: "There's no risk of losing a coin because everything goes through me anyway. So unless both sides perform, the coin doesn't move." He told investors he was sharing the commissions he earned on these transactions with them. In other words, if he transmitted a million dollars and 1,000 coins, he would get between 2% and 10% of the million dollars.

25.    As further described below, the investigation has gathered evidence providing probable cause to believe Mori has used his entities Crypto Calypso, Ltd. and Exseedingly Group, Inc. to operate an investment fraud scheme. As indicated above, bank records revealed that Joseph Mori is the principal of the business Crypto Calypso, Ltd.  Based on the public facing website, cryptocalypsoinvest[dot]com, Mori presents the business as "… an international crypto company engaged in crypto trading activities, which are related to trading on financial markets and cryptocurrency exchanges.  Our goal is to provide our investors with a reliable source of high income, while minimizing any possible risks and offering a high-quality service, allowing us to automate and simplify the relations between the investors and the trustees."  The contact information for the site shows an office address of 31 Edge Hill Rd., Wappingers Falls, NY 12590 and a contact of jmori@gony[dot]net.

26.    The website offered investors unrealistic returns. For instance, in an archived version of the website from March 19, 2024, Crypto Calypso was offering investors three

options: (a) a 100% return on investments of $250,000 over 30 days, (b) a 40% return on investments between $1,000 and $2,000,000 every 30 days, and (c) a 100% return on investments between $5,000,000 and $50,000,000 every thirty days.[1]

27.     Due to the unrealistic returns promised and Mr. Mori's criminal history, we investigated this offering as a potential Ponzi scheme and we sought to determine how it operated. The website had a contact page, which directed interested parties to contact phone number 845-809-2011, email address jmori@gony[dot]net, or mailing address 31 Wappinger Falls, New York 12590.

28.     IRS-CI initiated an undercover operation to "invest" in Crypto Calypso, Ltd. in a covert fashion.  On July 24, 2024, an IRS-CI undercover agent contacted Joseph Mori at jmori@gony[dot]net.  Initial instructions provided by Mori instructed the UCA to direct fiat funds to accounts at Brite Bank and later PNC Bank, both of which were rejected.  The UCA inquired about investing directly using cryptocurrency which Mori stated that he could.  Mori provided bitcoin address bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z (hereinafter "bc1que") to the UCA via email on July 31, 2024.  The UCA sent approximately $1,008.15 via Bitcoin to the bc1que address August 1, 2024 and cleared on August 2, 2024 (tx. hash ac75fae7866fe85143b0aefeaff26dad0652323961985ebd04d11da2cc43feda).  Mori acknowledged that he received the funds on August 8, 2024.  Mori also stated that "I [Mori] buy and sell crypto and make money on the commission, not the profit on the coin."

29.     On August 7, 2024, Mori transferred approximately $847.86 of BTC from his wallet, bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z, to his CashApp account (tx. hash

---

[1] This archived copy of the website was downloaded from a publicly available website that archives internet websites. It is available at https://web.archive.org/web/20240319212043/https://www.cryptocalypsoinvest.com/. In my training and experience the archived webpages here are reliable copies of the websites as they appeared, though some widget and photos may not get captured or render perfectly.

7fd7e38603a13b0bd183dbd365cb16a21e0aed6093f38306953598ced2217c0f).  Mori's CashApp account ending in XXXXXXXpyhm is registered to Mori at his residence, 31 Edge Hill Rd., Wappingers Falls, NY 12590.  Subpoena records indicate that logins to the account at this time are associated with a device titled "Joseph's S20 Ulra."  IP data provided from CashApp indicates that the account was accessed using a Verizon Business Internet Service Provider from both a browser and "Joseph's S20 Ultra," using IP address 173.62.81.236.  The account was also accessed by a T-Mobile Internet Service Provider from "Joseph's S20 Ultra," using IP address 172.58.299.216.

30.    On August 8, 2024, Mori represented that the UCA would receive a 20% return on his investment after approximately 30 days.  Mori also stated that the UCA could reinvest his earnings for an additional 20% in another 30 days.  The UCA requested that Mori repay him the initial investment plus 20% return (approximately $1,200) to an address provided by the UCA in Utah.  The UCA received an email from Novo Bank on September 12, 2024 stating that a $1,200 payment was being sent by Synergy Services Group, Inc. to the address the UCA provided to Mori.

31.    On or about September 12, 2024, the UCA sent a wire transfer for $2,000 from the District of Utah to Joseph Mori at a Novo Bank (Middlesex Federal) account ending in 6792.  The account was provided by Mori and was titled to Synergy Services Group, Inc.  The address on this account was 31 Edge Hill Rd., Wappingers Falls, NY 12590.

32.    The UCA invested approximately an additional $3,000.70 via Bitcoin to the bc1que address as directed by Mori.  The transaction was sent and cleared on September 12, 2024 (tx. hash 15693f5ba72006c17a32ab2b20e048d6e484fc66017d43623010b2cd35bac54a).

33.     On September 12, 2024, Mori transferred approximately $3,027.01 of BTC from his wallet, bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z (bc1que), to his Coinbase account ending in 3d91 (tx. hash b38012607643ddf414bb483eb71dff46487a1f4a314ce30fa61e9360864a77db).  Records provided by Coinbase list bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z as "Trezor-JM," in the production.  Based on my training and experience, the account holder can "annotate" addresses or transactions personally for convenience.  The account holder for this account is Joseph Mori and lists his address as 31 Edge Hill Rd., Wappingers Falls, NY 12590.  The account was verified with Mori's "selfie" photo and driver's license.  Mori is the only signer listed on the account.  Mori converted the BTC to USDC and spent it at E-Z Pass, Tivo, Adobe, Amazon Marketplace, and Verizon.

34.     On or about October 7, 2024, the UCA received a check from a Synergy Services Group, Inc. bank account at Middlesex Fed. Savings ending in 6792.  The UCA attempted to deposit the check but it was rejected for insufficient funds.  When confronted about this via email, Mori stated that he "rarely use[s] that account and something hit that I was not aware of," and signed the email Joseph.  He stated on October 31, 2024 that he would repay the UCA $7,200 via BTC.

35.     On or about December 17, 2024, Mori made a repayment to the UCA via BTC from his wallet bc1quehuef6vw0la885dxs9w5ydk5et7eft809ke5z for approximately $1,197.47 (tx. hash 1e161675e6502803c32f0213d7d9bfcbe6573e8ca19189eec30d68f453394cf3).  This payment was funded, in part, by a Binance.US account XXXX4215 owned by Jeffrey Hull, a resident of Wisconsin.  Based on my training and experience, it is common in Ponzi schemes for participants to be repaid with other victims' funds.

36.     On or about December 18, 2024, Mori made a repayment to the UCA via BTC from a wallet bc1q7zesnszs7cx6a069pa8076d444s4gd8y7fmjsc for approximately $6,009.64 (tx. hash b479e7cdc1c492071f3148509d0f33a90f07aedadc04b5bbf2cfea2234d32cb3).  This wallet was funded in part by a BTC transfer from ChangeHero.io.  Records provided by ChangeHero.io imply that the recipient address is a Trezor device.  Mori confirmed to the UC that he sent the repayment back to him.  ChangeHero.io is a cryptocurrency exchange service that enables users to swap crypto assets without KYC.  The payment was also funded, in part, by a transfer from HitBTC.com – Changelly.com.

37.     One of the BTC addresses that Mori provided to the UC was bc1que which can be attributed to cluster ID bc1q4de797ksltdy0taqg5vcgau45lmk40wfjruzkf containing 25 additional addresses.  This cluster has been active on the Blockchain from March 8, 2022 through April 14, 2025.  A total of $766,120.96 was received by this cluster and a total of $763,877.06 has been sent out.

38.     We have determined that Mori discontinued the use of the cryptocalypso.com website around December 2024, but continued the operation under the name "Exseedingly Consulting Group" on a publicly available website, "exseedinglygroup[.]com." The website for Exseedingly Group contains substantially the same graphics and information as the prior Crypto Calypso website. It also similarly offers outrageous returns over short periods, such as an 81% return in 30 days, a 500% return in 90 days, and so forth. These offerings appear to change periodically.

*Misrepresentations to Investors about Volume of Business*

39.     Because the investors' return was based upon his commissions, which were in turn based upon a percentage of the transactions he facilitated, transaction size and volume was

would be important to investors. As outlined below, Mori repeatedly misled investors about the volume of his business.

40.    According to Mori's own statements, the volume of transactions he facilitated would be reflected in his trezor wallet. On the January 13, 2025 town hall he mentioned the trezor wallet to investors and said that's what he uses:

> Oh, and by the way, I use hardware wallets, which I have in my possession. It looks like this. Does anybody want to buy one? It's called a Trezor. They have other companies that make it. My lawyer, my wife, and my brother have the code to that wallet . So if something should happen to me , they are able to get
> whatever is on there off.

41.    In the February 19, 2025 town hall, Mori shows the trezor and states that he does not use large commercial exchanges like Binance or Coinbase for his business, but the trezor:

> I use, now when you' re dealing with hot wallets, it's different types, you got exchanges like Coinbase, Binance, you know, big, large corporations that manage the , you know, millions of wallets . And, you know, they, you know, you know that the coin is safe because they're not going anywhere . I don 't use those . Then there's also other like trust wallet, you know, little companies that have come and set up wallets, you know, on their own , and they're pretty reliable . You know, they have good following and stuff . But then there's also these other like generic web based wallets, which I just shy away from because, you know, it's one, probably one guy running the whole show and you never know what's going to happen. But then what I use is hardware wallets . So hardware wallets, since I got the video, I'll show you basically. So I use a Trezor, which looks like this . So I keep everything on here . The nice thing about it, it can't be hacked, because unless you have the physical device, you can't get anything off of it.

42.    Mori was arrested in New York on June 11, 2025. On the same day, a search warrant was executed at his home pursuant to a search warrant. During the course of that search, we located two trezor wallets, a white one and a black one. The black one appears to be consistent with the one he shows investors in his videos. (The white trezor was examined and appeared to reflect no transactions after 2023.) The wallet is presently in FBI custody in Salt Lake City, Utah.

43.     Law enforcement agents were able to access and analyze Mori's black trezor wallet. The trezor wallet contains data reflecting the history of Mori's cryptocurrency transactions from 2022 to 2025.

44.     The data contradicts Mori's claims to investors. The trezor wallet data indicates he sent out just 37 cryptocurrency transactions during the entire year of 2024. The total value of the cryptocurrency transferred out of his wallet during 2024 was just $73,387.58.

45.     In contrast, during investor town halls and in his offerings on his website, Mori misleadingly suggested that he was doing many millions of dollars in cryptocurrency exchanges during this period and about two transactions per day.

46.     For instance, in the January 13, 2025 town hall, Mori suggested he had access through his private network to a market of billions of dollars of cryptocurrency transactions:

> Investor: Okay, I 'm back . Yeah, it sounds like there' s certainly no shortage of capital potentially flowing in. So my question is at what point do you run out of counterparties to do transactions with?
>
> Mori:     Excellent question. Let's just say the average Bitcoin deal for let's say, I mean, if you just do a thousand coins, Bitcoin is roughly, you know, it's approaching again, $100,000. So, you know, you do a thousand coins, that's a hundred million dollars . That's just, that's a thousand. If you 10,000, that' s a billion dollars . I routinely get asked to do deals of those sizes. So the, you know, to go into the billions is not an issue . That's, I got the market for that. So that's fine. And because it's all done in crypto, it's, I'm not moving a billion dollars in cash, I'm moving a billion dollars in crypto, which makes life a lot easier.
>
> Investor: Wow, okay.
>
> Mori:     I mean, I'm not there yet. I mean, I'd like to be, but I'm working on it.

47.     During that town hall, Mori indicated he had facilitated a hundred million dollar purchase of cryptocurrency: "The maximum transaction size I've done so far has been, I think it would have been a thousand coins at a hundred million."

48.     But according to the trezor data, the largest transfer of cryptocurrency from the trezor prior to the January 13, 2025 townhall was a transfer of approximately $65,000 worth of Bitcoin on December 19, 2023.

49.     The largest cryptocurrency transfer from his trezor wallet at any time prior to its June 11, 2025 seizure was a February 11, 2025 transfer of $255,000 worth of USDC on the Ethereum network. For the period of transactions reflected in the trezor—from March 8, 2022 through the June 11, 2025 date of seizure—the trezor transferred out just three transactions involving more than $100,000 in cryptocurrency. Thus, Mori's claim that he had conducted a $100,000,000 cryptocurrency-for-cash exchange appears to be false.

50.     During the February 19, 2025 town hall, Mori confirmed he was offering at that time a 500% return in a month, requiring a minimum investment of $500,000. That implies a return of $2,500,000 in 30 days. At the 10% commission rate, that implied to his investors that would be able to do at least $25,000,000 of cryptocurrency sales in a month. Again, for the entire year of 2024, Mori had transferred just $73,387.58 in cryptocurrency.

51.     In a third town hall, Mori told investors that the most he had paid out to someone was $1.2 million. The Trezor reflects no record of any payout in that amount. The Exseedingly Consulting bank records reflect no transfer in that amount (although there is a receipt of $1.6 million from an individual who has been interviewed and identified as an investor).

52.     An archived version of the website on July 10, 2025,[2] invites investors to invest up to $100,000,000 for 90 days, and promises a 600% return on that money. That 600% quarterly return—a 2,400% annualized rate return—implies an ability to return $600,000,000 to investors in 90 days. See the snip below:

---

[2] This archived version is publicly available from an online source that is, in my training and experience, reliable.



53.     Because he was soliciting investments of up to $10,000,000 (or sometimes $100,000,000) in his business, and claiming he was funding the investors' returns from his commissions, investors were interested in and asked about the volume of exchanges Mori engaged in. He provided false information. This presents probable cause to believe he engaged in wire fraud. In addition, because the returns were based on investors' passive investment on Mori's claimed efforts, the investment offers were securities. This presents probable cause to believe he engaged in not only wire fraud, but also securities fraud.

54. There is probable cause to believe not only that Mori misled investors about the volume of the business he was doing at Exseedingly as described above, but also about the returns on their investments. As shown below it appears he misled them about both the source of those returns and the true amount of those returns.

55. As indicated above, Mori reported to investors that their returns came from commissions of 1 to 10% of the value of cryptocurrency exchanges he facilitated. When he was arrested, however, he denied making any such commissions. We interviewed him at the time of his arrest and he reported he had ceased earning any commissions on cryptocurrency transactions before his prior conviction in 2022. That statement is in direct contradiction to his representations to investors.

56. Law enforcement conducted interviews of multiple investors in Exseedingly Consulting, Inc. throughout the course of the investigation. Investors—including investors in the District of Utah—confirmed that, when their investments matured per the plan they were subscribed to, their balances would be updated on their profile on Exseedingly Consulting, Inc.'s website. In some instances, investors were able to withdrawal their principal and returns from the platform but, in many instances, investors were unsuccessful in withdrawing from the Exseedingly Consulting, Inc. platform. Investors have made multiple attempts to withdraw from the platform and are unable to withdraw their principal or interest.

57. We have obtained a copy of the server hosting the Exseedingly website and we have searched the underlying data. While the search of the server continues, the Exseedingly data includes a column called "total invests." There is an entry in this column for each user. Each user is identified by name, email, and address in the table. During the course of the investigation, we have interviewed many Exseedingly investors.

58.    After obtaining the server data, we confirmed with a number of the Exseedingly investors that the "total invests" column reflected a combination of the funds they had invested and the returns on those initial investments that they had reinvested. (The data also includes separate data for "deposits," which appears to reflect the amounts the investor actually brought into Exseedingly excluding the reported returns.) In other words, if an investor had invested $5,000 and Exseedingly reported $20,000 gains to them, their total investment would be reflected in "total invests" as $25,000.

59.    The "total invests"—the initial investments and the reported returns—for all users in the Exseedingly database in September 2025 was reported to be more than $978 million, just short of $1 billion. Of that amount, his database records reflects that he took in approximately $18,855,752.16 in deposits from investors (recorded as successful deposits) and disbursed approximately $11,980,202.43 to investors (recorded as successful withdrawals).

60.    In other words, approximately $960 million of the "total invests" would have been the returns he was reporting to investors on a total of $18.8 million in Exseedingly investments. Of that $960 million, he has presumably paid out approximately $12 million. That leaves $948 million of reported returns unaccounted for.

61.    That $948 million he reported to investors does not appear to exist. Investigators have obtained records for bank accounts for Mori and his affiliated entities—Exseedingly, Trusted Transportation Group, Global Office Group, and Joseph Mori—from a variety of banks. This includes the accounts at Santander bank that were primarily used to receive investors' funds and to pay investors out when they requested withdrawals. As of September 2025, none of them had any significant funds on deposits. We have likewise received records pertaining to Mori's holdings at Binance and Coinbase. We have also reviewed blockchain information associated

with Mori's trezor wallets.  In all, there is only a couple hundred thousand dollars worth of cryptocurrency.

62.    Bank records show, for instance, that on the day he was arrested, June 11, 2025, Santander bank accounts for his entities Trusted Transportation Group, Global Office Group, and Exseedingly Group, had balances of $167,430.02 (Exseedingly Account x7804), $193,762.26 (Global Office Group Account x7812), and $494,906.57 (Trusted Transportation Group account x7847). But the records for these accounts show significant deposits after that date, which appear to be consistent with Exseedingly investor deposits.

63.    In short, it appears that Mori and those acting at his direction represented to Exseedingly's investors through the website that their investments collectively accumulated approximately $948 billion in returns on investment, and that those representations are false.

64.    For instance, the Exseedingly website reported to one investor that his investments had grown from his first investment of several hundred thousand dollars in early 2025 to September 2025 to more than $100,000,000.

65.    This implies Mori had brokered transactions to earn commissions of more than $100,000,000. Based upon Mori's representations to investors that he was earning commissions as high as 10%, this would imply he brokered at least $1 billion in cryptocurrency transactions in 2025 to fulfill the earnings of just one of his investors.

66.    But the data associated with the trezor wallet reflected that, in the entire year 2025, he had conducted only approximately $4 million worth of cryptocurrency transactions (approximately $2.1 million worth incoming and $1.9 million outgoing) from January 2025 until the seizure of the trezor device. That is about $996 million short of what would have been necessary to support his representations to that investor.

67.     And nowhere does Mori appear to possess the $100 million he reported to this investor as the earnings on his investment.

68.     Similarly, another investor invested $1.6 million on April 14, 2025. Mori and those acting at his direction reported to her through the website that her investment had grown to more than $20,000,000 by September 2025. This would imply that Mori had brokered cryptocurrency exchanges sufficient to earn more than $20,000,000 in commissions. Based on his representations, he would have to broker at least $200 million in transactions.

69.     But again, as reflected in the trezor device data, Mori never conducted anywhere near that volume of cryptocurrency transactions. Neither does Mori appear to possess $20 million to pay out to this investor's reported returns.

70.     In fact, a review of the funds received from this investor reveals that the investor's funds were used almost immediately to pay out other investors as returns on their investment, and to pay Mori and his affiliates, as described below.

71.     We have reviewed bank records for Exseedingly account x7804 and compared them with records from the Exseedingly server database. We identified the amounts, names, and dates on the credits and debits in Exseedingly account x7804 at Santander from the time of that investor's $1.6 million deposit and the days following. We were able to match many of those transactions with transactions identified in the Exseedingly database as investors "deposits" or "withdrawals." The following table reflects the results of that analysis:

**Sources & Uses of Funds in Exseedingly Consulting Santander Account x7804
April 14-17, 2025**

| Description | Amount |
| --- | --- |
| Funds deposited in x7804 not yet traced to Exseedingly investors: | $98,583.86 |
| Funds deposited in x7804 from Exseedingly investors: | $1,673,782.27 |
| Funds disbursed from x7804 to a different group of Exseedingly investors: | $469,798.42 |

| Funds disbursed from x7804 to Mori or his affiliates: | $248,929 |
|---|---|

72.    In other words, most of the money paid out to Exseedingly investors during this time came from other Exseedingly investors, not from commissions on cryptocurrency exchanges. Similarly, most of the money disbursed to Mori and his affiliates came from Exseedingly investors, not from commissions from cryptocurrency exchanges. This presents probable cause to believe Mori used new investor money to pay out earlier investors to promote the false illusion that they were earning returns through his cryptocurrency exchanges. In fact, the money just came from other investors.

73.    That pattern is also confirmed in an analysis of transactions associated with his trezor device during his interactions with the IRS undercover investigator. That trezor device is where he told his investors his cryptocurrency exchanges went through.

74.    During the 30 day period following the undercover operator's investments of approximately $2,000 and $3,000 in cryptocurrency for a 20% return on September 12, 2024, Mori's trezor wallet shows he engaged just two cryptocurrency transactions. The first was a receipt of approximately $480 worth of USDT-ETH (U.S. Dollar stablecoin on the Ethereum chain). The second was a transmission of that same USDT-ETH out of the wallet on the same day. Assuming those transactions included a receipt of cryptocurrency currency from a selling customer and transfer to a buying customer, the maximum expected commission would be $48, not the $1,000 Mori implicitly promised. And he paid out far more to the undercover operator as "profits" than the cryptocurrency transactions he engaged in during that time were even worth. This presents probable cause to believe the "profits" came from some source other than cryptocurrency exchanges.

75. We have also identified in bank account records for Exseedingly Consulting approximately $959,000 that was sent to other accounts for Mori or his businesses, Global Office Group, Trusted Transportation Group, or Exseedingly Consulting's account at Truist in Florida, where the funds were used by Bowlds. This amount too exceeds the expected commissions that would be possible based on potential commissions on the volume of cryptocurrency transactions observed on the trezor device.

76. This presents probable cause to believe that Mori was reporting returns on the investment that far exceeded the commissions, if any, he was actually earning on cryptocurrency transactions as he claimed to his investors.

77. Despite this, multiple investors reported getting paid out, including some measure of return on their investment. One investor ("Investor-16"), for instance, invested only a few thousand dollars according to the Exseedingly website data, but was paid out several hundred thousand dollars. According to the Exseedingly website data, Investor-16 was responsible for referring most of the remaining investors in Exseedingly. This presents probable cause to believe that Mori was using new investor funds to pay out earlier investors for purposes of falsely promoting the idea that that the business was successfully generating returns from commissions. In fact, he was just using new investor money to pay earlier investor obligations.

78. In my training and experience, sustaining this type of Ponzi scheme requires continuing infusions of larger amounts of investment. When new investments slow down, the scheme's operator cannot keep up with investor expectations. It appears that began to happen here when Mori solicitation of new investors was curtailed by the court. (Mori was arrested on June 11, 2025 and released on conditions that he (i) obtain employment other than being self-

employed; (ii) he not work for himself through his entities, but get a different job; and (iii) that he not engage in any transactions on any other person's behalf.)

79.     In an email supposedly sent to all Exseedingly Consulting, Inc. investors by support@exseedinglygroup[dot]com on August 1, 2025, it was stated that "we are about 30 days out for withdrawal requests. While some that have been request went faster, our queue is over 1,000 requests so it will take a little time to get it done. The volume of messages has been preventing us from processing much as a lot of our time has been going to answer messages. I have made modifications on the software to allow us to better deal with withdrawals more efficiently. We also have a large deposit of crypto coming in soon that will help us clear out the cache of crypto requests. Based on our estimations on how long things take, we should be all caught up on the current requests within the next30 days. Be patient, everyone will be taken care of. We are moving as fast as we can."

80.     Additionally, the August 1, 2025 email to investors stated, "we are not going out of business as some of the rumors that have been circulating are saying. The huge volume of withdrawal requests caught us by surprise and are being addressed. We were not equipped to handle such large numbers. But we are expanding our back office to accommodate them for the current clients and for future growth."  It also stated, "we have had a few credit card chargebacks. Anyone requesting a charge back will have their account cancelled and their principle returned via the credit card company. They can take 30 days or more to issue a refund, that is not within our control."  The email ended with "We hope this quells some of the anxiety out there and know that we are working feverishly to get everything in order and completed."

81.     Mori was prohibited as a condition of pretrial release from engaging in transactions of $5,000 or more or working for himself. To our knowledge, however, he has never

requested court permission to issue refunds or payments to his Exseedingly customer or investors. And, despite that court prohibition, he has spent more than $200,000 on new trucks since he was arrested, without notifying pretrial services or seeking court permission, as directed.

82.    When Mori was arrested, he voluntarily submitted to an interview after being apprised of his rights. During the interview, he denied he had earned any commissions from cryptocurrency exchanges since 2022. He claimed instead that the Exseedingly investors were investing in some kind of scheme related to standby letters of credit. That is not consistent with what he stated to investors in the town hall recordings as reviewed above. It is also not consistent with the messaging on the Exseedingly website, which discussed the nature of Exseedingly's business as dealing with cryptocurrency exchanges, with no observed mention of standby letters of credit.

83.    In my training and experience, the foregoing presents probable cause to believe that Mori was falsely reporting to investors the actual returns on their investment and, when paying out profits, he was either using new investor funds or funds owed to customers to pay out investors in order to falsely lead them to believe there were actual returns from the cryptocurrency exchange.

84.    We have performed a comparison of the investor cryptocurrency deposits recorded in the Exseedingly server against the deposits in the trezor wallet.  We used publicly available blockchain data to identify transactions involving the trezor wallet.  Each such transaction has a unique "hash" value, a multicharacter value. We also used the "address" recorded in the Exseedingly database for each investor withdrawal or deposit made using cryptocurrency to identify the hash value for each such transaction. We then compared the hash values for the investor deposits and withdrawals in the Exseedingly database with the hash

values for the transactions involving the trezor wallet for the period December 16, 2024 through July 8, 2025.

85.     Based upon that analysis, it appears that, from December 16, 2024 to July 8, 2025, the Trezor wallet received Exseedingly investor deposits of approximately $2,092,803.17 worth of cryptocurrency.  This incudes $726,563.21 of Bitcoin received from December 16, 2024 to June 19, 2025; $193,737.64 of ETH from February 13, 2025 through June 12, 2025;  $686.66 worth of Ether on June 14, 2025; $179,724.89 of USDC from January 10, 2025 through June 11, 2025; approximately $991,100.34 in USDT from December 18, 2024 through July 8, 2025; and approximately $990.41 in USDT (BNB) from February 23-24, 2025.

86.     During that same period, the Trezor wallet distributed Exseedingly investor withdrawals of approximately $1,368,327.35 worth of cryptocurrency.  This includes approximately $379,361.75 of Bitcoin from December 21, 2024 through June 10, 2025; approximately $181,125.50 worth of USDC from March 28, 2025 through June 11, 2024; and approximately $807,840.10 worth of USDT from January 7, 2025 through June 10, 2025.

87.     We assume, for purposes of this analysis, that transactions in the wallet for which we have been unable to identify as investor related transactions in the Exseedingly database are non-investor transactions. The total value of non-investor deposits during this period was $617,619.05 worth of cryptocurrency. The total value of non-investor withdrawals in cryptocurrency was approximately $794,429.80.  So, the wallet sent out approximately $176,810.75 more in cryptocurrency than it received from non-investor sources. The cryptocurrency in the wallet prior to December 16, 2024 was valued at $230.62. In other words, Mori could not have used any non-investor deposits to fund investor withdrawals. Similarly, Mori must have used some investor funds to fund non-investor withdrawals.

88.     This presents reason to believe there are no non-investor funds remaining in the wallet, and any remaining funds are present only because they were deposited by Exseedingly investors. Therefore, there is probable cause to believe the remaining balance of cryptocurrency on the wallet involves proceeds of the Exseedingly investment scheme and is fruits and evidence of that scheme.

## THE TARGET FUNDS

*Funds in Crypto Calypso, Ltd.'s, Exseedingly Consulting, Inc.'s, and Synergy Services Group, Inc.'s Accounts*

89.     Based upon the foregoing, there is probable cause to believe that all cryptocurrency on the trezor wallet is property that was used in and involved in his wire fraud and money laundering.

90.     The following sums appear to remain on the trezor, and constitute less than was received in the trezor during this period:

- 0.433157 BTC

- 6,544.68 Tether USDT (Ethereum Blockchain)

- 506.0188 USDC (Ethereum Blockchain)

- 25.1978 ETH

- 5,005 USDT (Polygon Blockchain)

- 1,555 USDT

## **CONCLUSION**

Based on the foregoing, I respectfully submit that based on the above-cited authorities and information, probable cause exists to believe that the TARGET ASSETS are subject to restraint.

DATED: June 4, 2026

JONATHAN HELMSTETTER, Special Agent
IRS Criminal Investigations

Subscribed and sworn to before me this
5th th day of June, 2026

Hon. DAPHNE A. OBERG
United States Magistrate Judge